IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES L. BAKER, | ) | CASE NO. 3:17-CV-2373 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Charles L. Baker ("Baker") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his application for

Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42

U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of

the parties.  Doc. 19.

As explained more fully below, the ALJ either did not consider one of the two opinions

provided by Baker's treating physician, Dr. Singh, or, if he did consider it, he failed to

sufficiently explain the weight he gave it.  Accordingly, the Commissioner's decision is

**REVERSED and REMANDED** for further proceedings consistent with this opinion.

## I. Procedural History

Baker filed his application for SSI on February 10, 2014, alleging a disability onset date

of November 1, 2008.  Tr. 168, 249.  He alleged disability based on the following: degenerative

disc disease, chronic lumbar pain, anxiety and depression.  Tr. 288.  After denials by the state

agency initially (Tr. 168) and on reconsideration (Tr. 185), Baker requested an administrative

hearing (Tr. 203).  A hearing was held before Administrative Law Judge ("ALJ") Timothy Gates

on August 16, 2016.  Tr. 75-119.  At the hearing, Baker amended his alleged onset date to February 10, 2014.  Tr. 78-79.  In his September 30, 2016, decision (Tr. 31-41), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Baker can perform, i.e. he is not disabled.  Tr. 40.  Baker requested review of the ALJ's decision by the Appeals Council (Tr. 247) and, on September 18, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Baker was born in 1972 and was 41 years old on the date his application was filed.  Tr. 249.  He has a GED and previously worked as a metal door assembler and as a masonry worker.  Tr. 86-88.  He last worked in 2007.  Tr. 86.

### B. Relevant Medical Evidence

P.B. Singh, M.D., Inc. On April 24, 2012, Baker saw certified physician's assistant Erin Garrison at the office of P.B. Singh, M.D., for a check-up and medication refill.  Tr. 405-406.  Baker complained of low back pain, stiffness, stress and depression.  Tr. 406.  On May 22, Baker presented with anxiety and irritability and told Garrison that it was getting worse and that it moderately limited his activities.  Tr. 403.  He was able to see a pain specialist for his back.  Tr. 403.  Garrison diagnosed him with anxiety, unspecified.  Tr. 404.

On July 10, Baker returned to Garrison for a checkup and medication refill.  Tr. 400.  He reported anxiety, panic attacks described as "agitation," and depression.  Tr. 400.  He also reported numbness but denied any weakness or back pain.  Tr. 400.  On exam, he was anxious and irritable but had a normal mood and affect.  Tr. 401.  Garrison diagnosed anxiety state (unspecified), depressive disorder and lumbago.  Tr. 401.

On January 4, 2013, Baker saw Garrison and reported constant and ongoing anxiety triggered by stress and also reported back pain and that he was seeing a pain specialist, Dr. Chowdhury.  Tr. 561.  Dr. Singh signed the note of this visit on February 3.  Tr. 564.

On February 5, 2013, Baker saw Garrison for a follow-up visit and medication refill.  Tr. 390.  He requested a referral to a different pain doctor, Dr. Katabay.  Tr. 390.  He complained of anxiety (constant and generalized), back pain (chronic, intermittent, worsening) and depression.  Tr. 390-391.  He reported stiffness, numbness and radicular pain.  Tr. 390.  Upon exam, he had tenderness, crepitus and decreased flexion and extension on range of motion testing in his lumbar spine.  Tr. 391.  On February 27, Dr. Singh signed this treatment note.  Tr. 393.

Baker continued to report depression, anxiety and back pain.  Tr. 286 (March 2013); 382 (May 2013); 378 (July 2013).  In September and November 2013 and January 2014 he also reported joint pain, Tr. 374, 370, 366, although his exam findings were normal other than tenderness and crepitus in his lumbar spine, Tr. 375, 371, 367.

On April 10, 2014, Baker began seeing physician assistant Andrew Baker at Dr. Singh's practice for checkups and medication refills (and Dr. Singh would later sign treatment notes of these visits).  Tr. 557-559.  That day, Baker complained of back pain and anxiety and denied joint pain.  Tr. 557-558.  Upon exam, he had tenderness in his lumbar spine and was anxious.  Tr. 558.  In May he said his low back pain was worsening and he was having difficulty sitting and finding a comfortable position.  Tr. 553.  Upon exam, he was in no acute distress and had tenderness in his lumbar spine and decreased rotation.  Tr. 554.  In September 2014 Baker returned for a follow-up visit and medication refill and complained of anxiety and back pain.  Tr. 549.

On April 29, 2015, Baker saw Andrew Baker and reported low back pain that shot down both legs. Tr. 821. He had not had any pain medication in seven months, his back pain had been getting worse, and he requested a pain management referral, having been released from his prior pain management doctor for taking "1 Vicodin." Tr. 821. Upon exam he had lumbar spine tenderness. Tr. 822.

From August 2015 through January 2016, Baker visited Andrew Baker chiefly complaining of mental health issues, depression and anxiety. Tr. 803, 806, 809, 812, 815, 818. He also complained of back pain in November 2015. Tr. 809.

On March 16, 2016, Baker stated that his mood was better and he had "no concerns." Tr. 800. Upon exam, he was anxious and in no acute distress. Tr. 801.

On May 31, 2016, Baker reported that he was seeing a different doctor for back pain, Dr. Ali. Tr. 848. He complained of back pain. Tr. 848. Upon exam, he was in no acute distress and had tenderness at his lumbar spine and decreased extension and lateral bending. Tr. 849. He was diagnosed with low back pain, tachycardia, and an unspecified mood disorder. Tr. 851.

<u>Dr. Chowdhury, M.D.</u> On May 10, 2012, Baker saw Tim Chowdhury, M.D., at the Marion Pain Clinic for his low back and bilateral hip pain. Tr. 341. In a letter to Dr. Singh, Dr. Chowdhury recalled Baker's history of back pain for 10 years, caused by doing masonry work, and noted that Baker had seen Dr. Katabay for injections and radiofrequency procedures which had helped him. Tr. 341. Baker then lost his insurance and was not able to continue with Dr. Katabay. Tr. 341. At his visit with Dr. Chowdhury, Baker reported his pain level as 9/10 and he had not had any pain medications prescribed over the last several months. Tr. 341. Upon exam, Baker was moderately obese, ambulated with an antalgic gait, had a "quite limited" range of motion of his lumbosacral spine due to pain, increased pain with lumbar forward flexion and

extension, and negative straight leg raise testing and an intact mental status exam. Tr. 342. He had tender points in his cervical paraspinal muscles upon palpation and tenderness bilaterally in his lower lumbar facet joints with positive facet loading test. Tr. 342. His reflexes and sensation were normal. Tr. 342. Dr. Chowdhury's impression was chronic low back pain and lumbar degenerative disc disease. Tr. 342. He started Baker on Lortab, set him up for a pain psychological evaluation, and recommended epidural steroid injections as they had worked in the past. Tr. 342.

On May 17 and 31, 2012, Dr. Chowdhury performed epidural steroid injections at L5-S1. Tr. 355, 352. On November 1, Dr. Chowdury performed a blood patch at L5-S1 due to a postoperative post-dural puncture headache. Tr. 349.

On January 10, 2013, Baker reported his pain had increased 20%. Tr. 339-340. He reported pain in his mid to lower back, hips and back of legs, and some pain in his neck and knees. Tr. 340. Upon exam, he had an antalgic gait and lumbar spine tenderness. Tr. 339. An MRI of Baker's lumbar spine taken the next day showed shallow disc displacement with superimposed central soft protrusion at the L4-L5 level resulting in mild to moderate central canal stenosis but no definitive nerve root compression. Tr. 358. He had mild retrolisthesis, shallow disc displacement, and mild facet hypertrophy at the L5-S1 level resulting in mild to moderate bilateral exiting neural foraminal stenosis without compressive discopathy. Tr. 358.

On February 26, 2013, Baker reported increased pain of 10-15%. Tr. 337-338. Upon exam, he had an antalgic gait, decreased range of motion, and lumbar spine tenderness. Tr. 337. On February 28 and March 14, 2013, Dr. Chowdhury performed medial branch blocks at levels L2-L5. Tr. 346, 343.

On September 16, 2013, Baker reported that his pain was generally the same but worse in his hips. Tr. 336. It was getting harder to walk or "set" for very long. Tr. 335. Upon exam, he had an antalgic gait and a decreased range of motion. Tr. 336.

Dr. Katabay, M.D. On April 17, 2013, Baker saw Adil Katabay, M.D. Tr. 431-432. He reported pain in the thoracic spine, low back, and bilateral lower extremities. Tr. 431. He had had the pain since 2002 and it was constant. Tr. 431. Upon exam, Baker had positive lumbar facet loading. Tr. 432. Dr. Katabay diagnosed lumbosacral spondylosis without myelopathy, sacroiliitis, and myalgia/myositis. Tr. 432.

On May 13 and June 3, 2013, Dr. Katabay performed bilateral diagnostic medial branch blocks at L3, L4, L5, and S1. Tr. 446, 445.

On July 17, Baker complained of thoracic pain down to both legs. Tr. 430. Upon exam, he had an antalgic gait and a positive facet loading test and sacroiliac joint inspection. Tr. 430. On August 26 and September 9, 2013, Dr. Katabay performed radiofrequency ablation to the medial branches at L3, L4, L5, and S1 on the right then left side, respectively. Tr. 444, 443.

On October 16, 2013, Baker complained of pain from his thoracic spine down to his legs bilaterally. Tr. 429. He reported 50% benefit from his procedure in September. Tr. 429. Upon exam, he had an antalgic gait. Tr. 429. On December 16, 2013, and January 13, and 27, 2014, Dr. Katabay performed bilateral sacroiliac joint injections. Tr. 436, 592, 440-441, 587.

On March 13, 2014, Baker reported pain in his mid-back and increased pain in his low back and legs. Tr. 426. He reported significant relief from his injections. Tr. 426. Upon exam, he had a normal gait, positive straight leg raise testing bilaterally, and thoracic spine trigger points. Tr. 425-426. Dr. Katabay diagnosed lumbar radiculitis and fibromyalgia. Tr. 426.

On April 3 and 17, 2014, Dr. Katabay administered epidural steroid injections at L5-S1. Tr. 581, 509.

A lumbosacral spine x-ray taken on May 1, 2014, was normal. Tr. 467. On May 7, Baker reported ongoing mid back, low back, and leg pain and that his injections and medication had helped. Tr. 511. Upon exam, he had a normal gait, positive bilateral straight leg raise testing, positive bilateral lumbar facet tenderness, positive lumbar facet loading bilaterally, and thoracic spine trigger point tenderness with palpation. Tr. 514. He was diagnosed with lumbar radiculitis, fibromyalgia, and lumbosacral spondylosis. Tr. 514.

On June 19 and July 3, 2014, Dr. Katabay performed bilateral diagnostic medial branch blocks at L2, L3, L4, and L5. Tr. 520, 525. On August 5, Baker returned to Dr. Katabay reporting 9/10 pain in his mid-back, low back, and legs. Tr. 527. On August 7 Dr. Katabay performed radiofrequency ablation to the medial branches at L2, L3, L4, and L5 on the right side, and on August 21, Dr. Katabay performed radiofrequency ablation to the medial branches at L2, L3, L4, and L5 on the left side. Tr. 533, 538, 541.

On September 24, 2014, Baker again reported mid-back, low back, and leg pain, level 9/10, and had similar positive exam findings as before. Tr. 546.

Dr. Bonasso: On May 21, 2014, Baker saw neurosurgeon Christian Bonasso, M.D., for a consultation for low back pain and leg numbness. Tr. 503-504. Upon exam, he had full strength in his arms and leg and intact deep tendon reflexes and sensation. Tr. 503. Dr. Bonasso recommended a new MRI and x-rays and otherwise agreed with Baker's current pain regimen. Tr. 503. On July 30, Dr. Bonasso wrote a letter stating that he had reviewed Baker's recent lumbar MRI scan that showed mild to moderate degenerative disc disease at L3-4 and L4-5, with no sign of stenosis or instability. Tr. 500-502. Dr. Bonasso did not recommend surgery but

recommended other options such as chiropractic therapy, lumbar traction, or continued injections. Tr. 500. The findings in the MRI were stable or slightly better in comparison to Baker's January 2013 lumbar MRI. Tr. 502.

Dr. Prok, M.D.: On February 2, 2015, Baker saw Aleksey Prok, M.D., for low back and right leg pain, rated 8-9/10. Tr. 615. He reported that he had discontinued treatment with Dr. Katabay due to a difference of opinion and missed appointments. Tr. 615. Upon exam, he was obese, distressed, and he had an antalgic gait, positive facet maneuver bilaterally, full muscle strength in his extremities, normal reflexes, negative straight leg raise testing, and bilateral SI tenderness. Tr. 615-617. Dr. Prok assessed high risk medications and lumbar degeneration disc disease. Tr. 617.

Dr. Ali, M.D.: On May 11, 2015, Baker saw pain management doctor Rao Ali, M.D. Tr. 747-753. He reported bilateral shoulder pain, middle back and lower back pain, and bilateral hip, leg and foot pain. Tr. 747. Upon exam, he had an antalgic gait, full muscle strength, decreased response to pin prick in the bilateral L4 and L5 dermatomes, decreased biceps and patellar reflexes, and positive responses in the following tests: occipital compression, cervical facet loading, straight leg raise, lumbar facet loading, and Faber testing. Tr. 751-752. He had cervical, lumbar and right hip tenderness. Tr. 752. Dr. Ali diagnosed cervical radiculitis, cervical spondylosis without myelopathy, cervical disc degeneration, lumbar radiculitis, lumbar spondylosis without myelopathy, lumbar degenerative disc disease, and sacroiliitis. Tr. 752. Baker reported that past injections had helped and Dr. Ali recommended further injections. Tr. 752.

On June 10, 2015, Dr. Ali administered radiofrequency ablation to the lumbar medial branches at L3, L4, and L5. Tr. 741. On August 12 and 26, 2015, Dr. Ali performed a caudal epidural injection for lumbar pain. Tr. 727, 733.

On September 14, Baker had the same complaints and same exam findings as before. Tr. 723-725. On October 7 and 21, Dr. Ali performed medial branch blocks at T8, T9 and T10, bilaterally. Tr. 708-709, 717. The treatment diagnoses were thoracic spondylosis without myelopathy or radiculopathy and thoracic degenerative disc disease. Tr. 709.

On November 2 and December 7, 2015, Baker reported the same symptoms as before, with similar physical exam findings (except that Baker did not have lumbar facet tenderness or a positive lumbar facet loading test). Tr. 704-706, 700-701. On December 9, 2015, Dr. Ali performed radiofrequency ablation at T8, T9, and T10. Tr. 694, 696.

On May 9, 2016, Baker reported pain as before and Dr. Ali recorded similar physical exam findings as before. Tr. 825-827. Baker reported that his lower back pain was helped more than 50% for 9-10 months after radiofrequency ablation. Tr. 825. On June 1 and 15, 2016, Dr. Ali performed radiofrequency ablation to the medial branches at L3, L4, and L5. Tr. 868, 859.

On June 27, 2016, Baker reported pain as before and stated that his middle back pain was helped more than 50% for more than 6 months but was now getting worse. Tr. 854. Exam findings were similar as before. Tr. 855-856. He recommended a follow up in 8 weeks and no injections at that time since Baker's pain was improving. Tr. 857.

## C. Medical Opinion Evidence

### 1. Treating Source

Dr. Singh completed an undated "Basic Medical" form that lists Baker's "Date of Last Exam" as May 8, 2013. Tr. 395. Dr. Singh opined that, in an 8-hour workday, Baker could

stand/walk for 2 hours total, 30 minutes at a time; sit for 45 minutes total, 15 minutes at a time; and frequently lift/carry 6 to 10 pounds and occasionally lift/carry 11-20 pounds. Tr. 395. He was extremely limited in pushing/pulling, bending, and repetitive foot movements; moderately limited in reaching, handling, and seeing; and not limited in hearing and speaking. Tr. 395. When asked what observations and/or medical evidence led to his findings, Dr. Singh stated that Baker had a history of chronic back pain, was currently seeing a pain specialist, and suffered from depression and anxiety. Tr. 395. Dr. Singh also opined that Baker's limitations would be expected to last 12 or more months and would render him unemployable. Tr. 395.

On January 13, 2014, Dr. Singh wrote a letter stating that Baker was a patient currently under his care who had been diagnosed with degenerative disc disease and who has chronic lumbar pain which was intermittent, radiating, and worsening. Tr. 394. Baker was currently seeing pain management specialist Dr. Katabay and also suffered from anxiety and depression. Tr. 394. Dr. Singh stated that, due to his problems, Baker was "currently unable to work" and that it was his "medical opinion that [] Baker is currently disabled." Tr. 394.

### 2. Consultative Examiner

On May 2, 2014, Baker saw Khozema Rajkotwala, M.D., for a consultative examination. Tr. 464-471. Baker reported lumbago, bilateral hip pain, knee pain, hypertension, and depression. Tr. 464. Upon exam, Baker had intact sensation, full muscle strength, normal fine and gross motor control, no muscle spasms, an intact gait, and intact ranges of motion in his cervical spine, shoulders, elbows, wrists, hands, fingers, hips, knees, and ankles. Tr. 466, 468-471. He had a reduced range of motion in dorsal lumbar spine and positive straight leg raises. Tr. 466, 470. A low back x-ray revealed no significant abnormalities. Tr. 467. Dr. Rajkotwala

opined that Baker could sit, stand, and walk with some difficulty and could lift and carry 15 to 20 pounds frequently and 20 to 25 pounds occasionally.  Tr. 466.

On February 9, 2016, Baker saw Nancy Renneker, M.D., for a consultative examination. Tr. 755-760.  Upon exam, he tended to drag one or both legs while ambulating and was observed to grab onto the backs of chairs for assistance.  Tr. 757.  He had a reduced spinal range of motion, positive straight leg raise testing, decreased sensation in the bilateral L5 dermatomes, and pain with strength testing in the bilateral ankle dorsiflexors and bilateral tendons in his feet. Tr. 757.  Dr. Renneker opined that Baker could sit for a maximum of 25 minutes at a time for a total of 2 hours, stand for a maximum of 15 minutes at a time; occasionally walk for 5 to 10 minutes at a time on a level surface for less than a total of 2 hours; occasionally lift from knee height to shoulder height an object weighing up to 8 pounds; frequently handle, finger, and feel; occasionally carry objects weighing 8 pounds no more than 5 to 10 yards on a level surface; and could never push or pull, reach, perform floor to waist bending, twist, crouch, climb, operate foot controls, or operate motorized equipment.  Tr. 757-760.

### 3. State Agency Reviewers

On May 30, 2014, state agency reviewer Leslie Green, M.D., reviewed Baker's record. Regarding Baker's physical residual functional capacity (RFC), Dr. Green opined that, in an 8-hour workday, Baler could occasionally lift and/or carry up to 20 pounds and frequently lift and/or carry up to 10 pounds; stand and/or walk for a total of about 6 hours and sit for a total of about 6 hours; frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; and never climb ladders, ropes, or scaffolds.  Tr. 162-163.  On October 10, 2014, Paul Morton, M.D., reviewed Baker's record and, with the exception of a few postural changes, adopted Dr. Green's opinion.  Tr. 178-179.

**D. Testimonial Evidence**

**1. Baker's Testimony**

Baker was represented by counsel and testified at the administrative hearing. Tr. 77. He lives with his girlfriend in a house that she rents. Tr. 84-85. He is able to drive "a little," or about 40% of the 100% that he used to drive. Tr. 85. He only drives to nearby places and can't sit in a car constantly for over a half an hour. Tr. 85. He has to pull over and stop because his leg muscles cramp and lock up. Tr. 85.

The last time Baker worked was in 2007 assembling metal doors, but his employer had to let him go because he could no longer perform that work; it required him to stand on concrete floors. Tr. 87. He was on his feet the entire shift and had to lift about 20-25 pounds. Tr. 87. He used to do masonry work but injured his back performing that work while carrying concrete one day: he "blowed a disc." Tr. 88-89.

Currently, Baker is unable to work because of "constantly turns in my back" and his memory, legs, and his physical condition. Tr. 89. His inability to perform work is what causes his depression and anxiety to kick in. Tr. 89. His memory problems started about a year ago and he loses control of his mind and falls asleep. Tr. 90. Sometimes his mind goes blank and he does not remember what happened the day before, an issue he believes is a symptom of his schizoaffective disorder. Tr. 107-108. He sees a counselor; he went for six months and they signed him up for another six months because they are trying to help him. Tr. 90-91.

Baker also goes to Dr. Singh's office and sees his assistants, one of whom was Andrew Baker, who has since moved to another practice. Tr. 91. Andrew Baker helped him with his psychological treatment by putting him on the right anxiety medication, nerve medicines and

blood pressure medication.  Tr. 91.  Baker helped him until he could get into counseling and the counselor could take over his mental health treatment.  Tr. 92.

When asked how far he could walk before needing to stop and sit down, Baker answered "100 yards tops" because of the muscles in his legs and his knees.  Tr. 93.  His legs cramp up tight, severely.  Tr. 93.  If he tries to stand in one place he feels pressure on his discs.  Tr. 93.  He is always hunched and could not stand for over 10 minutes.  Tr. 93.  He could sit for 10 minutes at the most: "I always got to try to move around."  Tr. 93.  "It's my back versus down my – both sciatic nerves and in the groin."  Tr. 93.  He has spasms all the way from his back down both legs.  Tr. 93.  This has been going on "for good part of years" but has gotten worse the last couple of years.  Tr. 93-94.  "They" have him on a restriction of lifting 10 pounds because of the diseases in his back and the way his muscles are and his ability to bend is "horrible."  Tr. 94.  He can't even put on his socks and shoes sometimes.  Tr. 94.  The last few years he has also gained up to 50 pounds.  Tr. 94.  He just lost 15 pounds and is now down to 310; he is 5'11".  He does not believe his weight causes any problems for him.  Tr. 113.

Baker is not involved in any activities outside the house.  Tr. 95.  He goes to the grocery store and everything goes in the cart.  Tr. 95.  Sometimes he can push a full cart of groceries but sometimes he can't, so he will just stay in the car stretching and waiting.  Tr. 95.  He can't clean anything down low and could maybe wipe something in front of him that is the same height, but his girlfriend does all the cleaning.  Tr. 95.  The house they live in has one step to get in the house; the house is a two-story house but he goes upstairs rarely, maybe twice a month.  Tr. 95-97.  The ALJ commented upon a record showing that a few months ago, Baker had been visiting his father and Baker's brother pulled a gun on him.  Tr. 98.  Baker does not get along well with his family and they are not a support system for him.  Tr. 99.  He does not socialize anymore

with friends. Tr. 99. He is on medication for anxiety and depression and they help to the point where "they're not hardly much at all." Tr. 99. Quite often, Baker has anxiety, which gets worse when he is in a room full of people. Tr. 104. He also has depression and problems sleeping. Tr. 105.

Baker stated that, when his pain goes down his legs, it goes all the way to his feet. Tr. 99. He sits in a recliner with his legs up and sometimes his legs will lock up and he can't get out of the chair. Tr. 100. When this happens he eases himself up and try his best to walk on it. Tr. 100. If he is lying in bed when it happens he just lets them cramp and stays there a few hours. Tr. 100. He also has tingling in his feet and numbness in his hips. Tr. 100-101. The pain goes back and forth from hip to hip but it is constant. Tr. 101. When he experiences pain he tries to massage it out; he also has a TENS unit, which he used daily, and he uses a heating pad about two to three times a week. Tr. 102-103.

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Eric Pruitt testified at the hearing. Tr. 113-118. The ALJ discussed with the VE Baker's past relevant work. Tr. 114. The ALJ asked the VE to determine whether a hypothetical individual with Baker's age, education and work experience could perform his past relevant work or any other work if the individual had the following characteristics: can perform light work per the regulations (i.e., lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk up to 6 hours in an 8-hour workday and sit up to 6 hours in an 8-hour workday); can frequently climb ramps and stairs but never ladders, ropes or scaffolds; can frequently balance and stoop and occasionally kneel, crouch and crawl; can perform simple, routine tasks; and can have occasional interaction with supervisors, coworkers and the general public. Tr. 114. The VE answered that such an individual could not

perform Baker's past work but could perform work as a bench assembler (28,500 national jobs, 1,650 Ohio jobs); line solderer (71,400 national jobs, 2,900 Ohio jobs); and routing clerk (82,200 national jobs, 4,300 Ohio jobs). Tr. 115-116. The ALJ asked the VE if there were jobs such an individual could perform if the individual was limited to sedentary work, could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch, and could never crawl or climb ladders, ropes or scaffolds. Tr. 116. The VE answered that such an individual could perform work as a printed circuit board inspector (51,775 national jobs, 2,670 Ohio jobs); table worker (23,000 national jobs, 1,200 Ohio jobs); and film touch-up screener (48,500 national jobs, 2,500 Ohio jobs). Tr. 116-117. The ALJ asked the VE if either hypothetical individual described could perform those jobs or any other jobs if the individual could not work an 8-hour workday or 40-hour workweek or would be off-task 10% of the time and the VE answered no. Tr. 117.

Baker's attorney asked the VE whether an individual who would miss two or more days a month could perform work and the VE answered that such an individual could not. Tr. 118.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.   If claimant is doing substantial gainful activity, he is not disabled.

2.   If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.   If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.   If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.   If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his September 30, 2016, decision, the ALJ made the following findings:

---

[1] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

1. The claimant has not engaged in substantial gainful activity since February 10, 2014, the application date. Tr. 33.

2. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine and anxiety-related and affective disorders. Tr. 33.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 33.

4. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.967(b) except the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently; the ability to push and pull is defined by the ability to lift and carry; can sit for six hours in an eight-hour day; can stand and walk up to six hours in an 8-hour day; can frequently climb ramps and stairs, never climb ladders, ropes, or scaffolds; can frequently balance and stoop; and can occasionally kneel, crouch, and crawl. Mentally, the claimant is limited to performing simple, routine tasks and can have occasional interaction with supervisors, co-workers, and the general public. Tr. 35.

5. The claimant is unable to perform any past relevant work. Tr. 39.

6. The claimant was born in 1972 and was 41 years old, which is defined as a younger individual age 18-49, on the date the application was filed. Tr. 40.

7. The claimant has at least a high school education and is able to communicate in English. Tr. 40.

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills. Tr. 40.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 40.

10. The claimant has not been under a disability, as defined in the Social Security Act, since February 10, 2014, the date the application was filed. Tr. 41.

### V. Plaintiff's Arguments

Baker argues that the ALJ erred in weighing the opinion of his treating physician, Dr.

Singh. Doc. 15, pp. 20-24.

### VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

Baker argues that the ALJ erred when he weighed the opinions of his treating source, Dr. Singh. Doc. 15, p. 20. He asserts that the ALJ considered only one of Dr. Singh's two opinions. Id.

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the

physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(a)-(d); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Dr. Singh provided two opinions; (1) his undated "Basic Medical Form," which is a function-by-function analysis of Baker's limitations (Tr. 395); and (2) a letter dated January 13, 2014, in which Dr. Singh wrote that Baker was "currently unable to work" and was "currently disabled" (Tr. 394). The ALJ stated,

> The opinion of Parminder B. Singh, M.D., the claimant's treating physician, indicating that the claimant is "currently unable to work" and is "currently disabled," is given little weight because it does not provide a function-by-function analysis of the claimant's limitations, does not indicate what objective findings this opinion is based on, and a determination of who is "disabled" or unable to work is an area reserved to the Commissioner (Exhibits 2F, pp. 34, 35; 11F, p. 39).

Tr. 38. Exhibit 2F, p. 34 and 11F, p. 39 are both copies of the January 2014 letter written by Dr. Singh. Exhibit 2F, p. 35 is a "Basic Medical" form, the function-by-function analysis completed by Dr. Singh.

Although the ALJ included the record citation to the "Basic Medical" form opinion (Exhibit 2F, p. 35), the ALJ did not explain the weight he gave to this opinion, as evidenced by the following: First, the ALJ refers to the "opinion" by Dr. Singh, rather than "opinions." Second, the ALJ quotes the January 2014 letter as Dr. Singh's opinion ("currently unable to work" and "currently disabled") and rejects it because it is an area reserved to the Commissioner. Third, the ALJ criticizes the opinion as not being a function-by-function analysis, although Dr. Singh's "Basic Medical" form opinion is a function-by-function analysis. See Tr. 395.

Defendant argues that the remaining reason given by the ALJ—Dr. Singh did not indicate what objective findings the opinion is based on—does apply to the "Basic Medical" form opinion. However, the ALJ never discussed the "Basic Medical" form at all beyond a bare

citation.  Thus, the Court cannot be certain that the ALJ was referencing the "Basic Medical" opinion when he stated that Dr. Singh did not indicate objective findings; notably, Dr. Singh did not indicate any objective findings in his January 2014 letter opinion, so the failure to indicate objective findings would apply to both opinions.  Even if the lack of objective findings would be sufficient to discount Dr. Singh's "Basic Medical" opinion as controlling, the ALJ would still be required to give sufficiently clear good reasons for discounting it, which he did not do.  Finally, Defendant's assertion that the treating physician rule does not apply to Dr. Singh because Baker routinely saw Dr. Singh's assistants, not Dr. Singh, lacks merit because the ALJ characterized Dr. Singh as Baker's treating physician, evidently considering Dr. Singh to be his treating physician.

In sum, the ALJ erred when he failed to consider the "Basic Medical" form opinion of Dr. Singh or failed to sufficiently explain his reasons for giving the opinion little weight, making it impossible for the undersigned to determine whether the ALJ gave it any weight and/or the reasons for the weight, if any, assigned.  *See Wilson*, 378 F.3d at 544.

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED and REMANDED** for proceedings consistent with this opinion.[2]

IT IS SO ORDERED.


Dated: September 25, 2018

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge

---

[2]  This opinion should not be construed as a recommendation that, on remand, Baker be found disabled.